, David Perk, and Timothy Enix). And I understand that we will be beginning with Mr. Diehl, and I understand that, let's see here, each of counsel for the three defendants would like to reserve two minutes for rebuttal. Mr. Diehl, can you just, I don't have all the pieces for me, are you appearing on behalf of which defendant? Mr. Jenkins. Mr. Jenkins. Are we going to go in the order of Jenkins, Perkin, Enix, is it Enix or Enix? Enix. Enix. Okay, thank you. Yeah, please proceed. Thank you, Your Honor. May it please the Court, I'm Michael Diehl representing Andre Jenkins, and this case is about numerous things, not the least of which is reflected in the words of one of the primary witnesses called here, Philip Caruso, when asked, so you're pretty good at telling lies, his response was, sometimes you've got to lie. There were so many lies told by the government's witnesses in regards to the proof that Mr. were difficult to catalog in the brief that I submitted. Let me just ask you, are you starting with the sufficiency of the evidence then? I am. And can you specify, are you making a cross-cutting argument as to all the counts, or are you going to address particular ones?  But as you could probably glean from the brief, up until the end of the trial, there was a unified defense effort between the three defendants. Mr. Enix and Mr. Perk were essentially indicted as leaders of the Kingsman Motorcycle Club, and their attorneys undertook the vast majority of the defense on the RICO conspiracy, and the counts distinctly related to those. Mr. Jenkins' attorneys, myself and Mr. Covert, focused on defense of the homicides at issue, of course, the theory being that Mr. Perk ordered Mr. Jenkins to commit the two homicides during the course of this committing the overt act supporting the RICO conspiracy. So our focus at trial was to defend Mr. Jenkins. The remainder of the defense was left to counsel for Enix and Perk, although Mr. Perk's attorneys also participated in the homicide defense as well, because he was alleged to have ordered the murders as the leader of the Kingsman Club. So I believe, to some extent, the arguments cut across all counts. Having said that, understanding that Rule 29, credibility determinations are typically, generally, almost always left to the determination of the jury, unless testimony at issue is incredible on its face. Which generally relies on claiming that they're defying the law of gravity, right? Or something along those lines, not just lying a lot. Or let me put it this way, can you point to any case in which we have held that a cooperating witness is incredible as a matter of law or on its face? I can't point to any case where, generally speaking, that would be the holding. So this would be the first time? It sure would. Okay. But this isn't just a cooperating witness whose credibility is attacked because of the fact of their cooperation. Of course, a cooperating witness could either be cooperating to prevent charges from being filed, or to minimize their own exposure after having pled guilty in the matter at hand. There were at least five material witnesses, I set their testimony out in the brief, that purported to implicate Mr. Jenkins directly, whether they testified as to their own observations, or to statements that Mr. Jenkins allegedly made. And it wasn't just attacking their credibility because they were trying to lessen their own exposure. They lied repeatedly. They were charged, several of them were charged with lying in the grand jury, and that that was part of their cooperation agreement. They admitted lying to investigators during the course of the investigation. They admitted lying in the grand jury. Some of them even admitted lying during the course of their testimony in this particular trial. And this was all put before the jury, correct? It was all put before the jury. So the jury was enabled to make these assessments. The exact same arguments you're making to us, you were able to put to 12 jurors, and they unanimously disagreed, right? That's accurate. So the question is whether it's a factual matter. They, all 12 of them were wrong. Well, I believe, Your Honor, that when confronted with every material witness that lies to the extent that these material witnesses lie, the only similarities that these witnesses testified to was in conformance with the theory of the government. And I believe that the jury was absolutely capable of acquitting Mr. Jenkins based on those lies, but for the fact that a split in the joint defense approach occurred at the end of the, towards the end of the proof. Is this the, Mr. Enix's statement to the FBI about he's glad they got the right guy? Yes, Your Honor. So I was going to ask you, actually, I was hoping you would get to that point. Would you, I have two questions. One is, did that, the admissibility of that statement come up before trial? Yes, it did. And did the judge rule on that before trial? The judge ruled that there would be no severance based on a Bruton argument in pretrial motions that we filed. So you knew before trial began that that evidence would come in, correct? We knew that it was possible. The evidence would come in from the government, not at the direction of Mr. Enix's attorneys. But you knew the evidence was coming in. We knew that. Which would then, arguably, create a bifurcation of interests. It could create bifurcation of interests if it came in the way we would have assumed and which we could have dealt with, meaning that the government presented the agents and testified as to that statement or those statements. But that's not how it occurred at trial. How it occurred at trial was that during a pretrial, or a bench conference rather, the issue came up as to the FBI agent Samuel's intended testimony a day or so later, which is how this occurred, as in the middle of one witness at breaks or at the end of the day, we would talk about upcoming witnesses and any issues. It was a long, very long trial. And during the discussions regarding Agent Samuel's intended testimony or expected testimony, there was back and forth and dispute as to the prejudicial effect of those statements. There came a point where the government attorney decided that they would not introduce the statement. At that point, Mr. Enoch's attorneys said that that could influence their, that could prejudice their defense and that they intended, in sum and substance, it became clear that they were going to introduce that statement if the government didn't. That then became the break in the defense. And I can connect it to the in-chambers conference vis-a-vis the attentiveness of the jury. But in the in-chambers conference that Mr. Perks' attorneys and Mr. Jenkins, myself, and Mr. Covert were not a part of, as the court's aware, dealt with observations of jurors outside of the courtroom, Mr. Enoch's holding hands with a female who had been attending the trial as an observer. At that time, it became very clear, well, subsequently, it became very clear that the jury was paying attention to everything. They were certainly aware of circumstances outside of the courtroom. It's extremely reasonable to believe they'd be aware that a break in the defense wall, so to speak, had occurred. Okay. We've kept you up a little past your time. You've reserved two minutes for rebuttal. Why don't we hear from counsel for Mr. Perks? We have Mr., is it Mr. Easton? It's Mr. Easton, Your Honor. Mr. Easton, why don't you proceed, and I understand you would also like to reserve two minutes for rebuttal. That's correct. William Easton from Rochester for Mr. Perk, along with Ms. Myers Booth, who represented him at trial, and here. With the court's permission, I'd like to focus on three issues. Two are, for lack of a better term, I'd say, are process issues. The right to be present at the interchange that Mr. Deal has just briefly described, and secondly, is the interest of witness charge, and the third issue, much more substantive, it would relate to harmless error as to those two, but it's the sufficiency and the quantity and quality of evidence of accessorial liability. Could I ask you to take the interest of witness charge first? Would you mind just starting with that, but make sure you get to the others if we have time, but why don't you just start with that, and maybe tell us how that is inconsistent with Solano or the other cases we've. Yeah, I think it runs square into Solano on two fronts. First is the government's position on interest of witness is it wasn't error and it wasn't claimed. And I think that it was certainly our position is the case law, especially after this trial, which was concluded in May of 2018, is it is error. It certainly is inconsistent with the charge that was delivered in Solano and delivered also in Munaz as well as the other cases that I've cited, but Solano was 2020, Matau was. But could you just describe, I thought the gist of Solano and that line of cases is that they assume the guilt of the defendant. They say it's a motive to lie, but I don't see the motive to lie language here. So I didn't see where there is an assumption of guilt on the part of the defendant here, but I may be missing it, so could you tell us what is the language, what is the offending language in the charge that was given in your group? It is, it's threefold, Your Honor. First, it's the charge was that Enix and Kirk and any witness interested in the outcome of the case is biased or likely to be biased in favor of. But that's not assuming that they're going to lie. Well, they're. Well, of course they have an interest in the alphabet, that's just stating what's true, right? It's not assuming their guilt. Well, they also have, an innocent client is a coextensive bias or motive to tell the truth. Right, and that's why it didn't say, and therefore is more likely to lie. Well, it's, the language that was cited in Solano and Munoz was that it creates a motive to testify falsely. Right, and that's what I'm asking, where does it say they have a motive to testify falsely? The actual construction went on, may, motive to testify falsely and may sway that witness to testify in a manner that advances his or her interest, which is the same thing. In our case, it was Enix and Kirk were designated as interested witnesses and interested in the outcome of the case, and as such, they were biased or likely to be biased. And the court should, the jury should give their. So, in your view, the language that we criticized in the past that was guilt-assuming and therefore undermined the presumption of innocence, this language is equally bad that you can't even say that a defendant has an interest in the outcome because that somehow is, I don't know, finish that sentence for me. How does that affect the presumption of guilt? In the general credibility charge, I think it would be permissible for a court to say, you know, go through interests, you know, interested witnesses should be gauged from a variety of things. Even if that applies to the defendant? Well, to single out the defendant is the problem, Your Honor, is, and that's the problem that the games court and the successive decisions focus on, is to single out the defendant. I don't see this, I don't see the defendant singled out. This is about all the witnesses. And it says at one point, interest and disinterest are merely factors you may consider in evaluating credibility, so that's for everybody, it's. Doesn't it say you should examine and evaluate the testimony of the defendants? Just as you would the testimony of any witness with an interest in the outcome of the case. And, unlike Solano, you're not cross-referencing a motive to lie language. Other than the bias that we're saying is a functional equivalent to that, Your Honor. If a witness is biased or likely to be biased in favor of his or her interest, that witness has a motive to testify falsely. Well, that's just an inference that the jury might draw. I mean, they always draw, right? I mean, they're always going to be looking at people thinking, am I crediting you or not? But the question is whether the jury is being instructed by the judge that someone has a motive to lie, and therefore, the judge is undermining the presumption. Yes. And that's the nub of the issue. And our position is, in light of Solano and Munoz, I hope I'm not mangling that, is that both the court said in that charge it was if the defendant was an interested witness or to have a motive to testify falsely or sway his or her testimony. That is an interested witness. That's accomplished, and the quote was, it achieves the indirectly what Solano gains and Munoz achieves indirectly. This charge doesn't single out the defendants except to say that you treat them like any other witness, and then you go back to the instructions concerning any other witness, and it says they can be biased or not, and interest and disinterest are merely factors. Well, I think the district court judge said that Enix and Perk were interested witnesses, and singled them out as interested witnesses. Unlike, they didn't go through other jurors. And the harm to that, you would think, well, of course they're interested. You don't think the jury could figure out that they're interested witnesses? Yes, it's the obvious, and I think the quote that we go back to is from Gaines. With the court's permission, I'd read the quote from Gaines. If such a privilege would be a vain one, it's redundant, the privilege to testify as a defendant would be a vain one if the judge took, quote, whose lightest word the jury properly enough to give great weight would intimate the dreadful condition in which the accused finds himself should deprive his testimony of probability. So by saying that Perk and Enix were interested witnesses. That's the nub of your claim. Yes, and the interested witnesses are defined in such a way that they're biased or likely to be biased. It implicates the exact concerns in Solano, in Munoz, in Matzah, in Brutus, in Gaines. And it was certainly error from our perspective is that we don't see the functional difference between being biased or likely to be biased or having a motive to testify in your own interest that might sway your testimony. Okay, we have set aside two minutes for rebuttal. You can try to squeeze in a couple of your other issues there, but thank you for addressing our questions during this part. Let's hear from Mr. Grable on behalf of Mr. Enix, is that right? That's correct. Okay, and you've got two minutes set for rebuttal as well, Hank. I do, thank you. Good morning, may it please the court. My name is James Grable, I am counsel for Appellant 10 Enix and was his trial counsel under the Criminal Justice Act in the district court. And I also hope to reach three issues if I'm able in the time that's allotted, thank you. I'll begin, it may seem strange to begin at the end of this indictment, but I'd like to begin there with count nine. It was count 45 in the original superseded indictment, but renumbered at the trial as count nine. I begin there because- I'm sorry, this is a 924C related to the South Buffalo Clubhouse? Precisely. Okay, good. Yes. Yes, and the issue with count nine is, was there any evidence to establish, as a matter of sufficiency, that the South Buffalo Clubhouse was maintained, I'm sorry, that Tim Enix used or carried or possessed a firearm in furtherance of maintaining the South Buffalo Clubhouse as a drug premises? The answer to that question is no, but this court's cases talk about a nexus. When it talks about the notion of in furtherance, the court in Finley in 2001, and then in the Luder case in 2005, and then in the Snow case in 2006, and some others. The court talks about the need for there to be a nexus between the gun that's carried and the drug conduct at issue. And here, that nexus never materialized. The government argues at pages 89 to 91 of its brief, that there were guns used, in the words of the government's brief, they kept firearms to deter law enforcement from interfering in club business. And that's at page 89, and there's a string cite to various portions of the record. So, can I ask you on this point, because I think it's an interesting issue. Is it correct that the jury was charged on count nine as well as, I think it was counts eight and two, or maybe other ones, on a Pinkerton theory of liability as well? They were. And can you tell me, because I understand your argument that there's no evidence that Mr. Pinkerton was involved in the South Buffalo Clubhouse, except I guess he went to other clubhouses sometimes carrying a gun, right? He would carry a gun in Florida. He had a lawful permit, and he was the president of a clubhouse in Florida. Yeah, but I mean, was there evidence that he carried a gun to the South Buffalo Courthouse? There was evidence that he was in a gun, had a gun in a picture, a Christmas card picture, a long arm, a rifle that was introduced into evidence by the government. And was there any evidence linking that to the South Buffalo Courthouse, that picture? It was taken in the South Buffalo Courthouse. It was taken, okay, thank you. All right, I may have missed that then, okay. No, that's okay. But in any event, with respect to the Pinkerton theory then, why would there not be adequate evidence that the guns that were kept at the South Buffalo Courthouse were kept to further the evil mission, let's call it the criminal mission of the clubhouse? And why would he not be liable under a Pinkerton theory there? Could you explain that? I can, and I'm happy to. And you take me to the tether between Counts 9 and Counts 8, maintaining the South Buffalo Clubhouse as a drug premises. This Court's cases say that you can't just have a gun and drugs, even in the same place, and have there be, just by virtue of them being in the same place, a nexus. There has to be something more to show that nexus. What must there be? This Court's cases and other courts talk about the vicissitudes of the drug trade. But here, there has to have been, you can't invent Pinkerton liability out of whole cloth, meaning Pinkerton can't create liability for an offense that nobody committed, that nobody committed. And so if none of the Kingsmen are guilty, and certainly not Tim Enochs, of carrying a firearm in a way that was joined or connected to maintaining the South Buffalo Clubhouse as a drug premises, you can't have Pinkerton liability either. In other words, someone has to have committed the substantive offense in order for Enochs to be liable on a Pinkerton theory. Are you saying that when they were kept at the clubhouse, nobody used or carried within the meaning of 924, or no one possessed? Or are you saying that we can't identify who? I'm saying, the first point, that they were not carried in connection with maintaining the South Buffalo Clubhouse as a drug premises. So you're saying, you acknowledge there's evidence there were guns there, you acknowledge there were drugs sold there, but you're saying there's an insufficient nexus between the drug sales and distribution and the guns being there. I'm saying that the record proves that there was not a connection. And in particular, the appendix at page 13167 and 68, and I know it's a daunting appendix, but those two pages in particular, my colleague, Ms. Myers-Buth, asked Emmett Green, a government cooperator who was the regional president of New York. So he was in a position to know about the South Buffalo Clubhouse. And Ms. Myers-Buth asked him, so they, meaning the guns in the clubhouses, were there to protect membership from rival gangs, correct? Not to sell drugs. Green answered that question, yes. He affirmed that there was not a nexus. The government never went, never established a nexus. And the reason they didn't establish a nexus is because it didn't exist. This was, these were motorcyclists who were afraid of 1% clubs. There's ample evidence in the record that these folks kept guns in their clubhouse because they were constantly in fear that the pagans or the outlaws or some actual 1% club would storm their clubhouse and take over the clubhouse and do them harm. And so I think if the court compares that portion of the record I've just cited to the string site at page 89 of the government's brief and the absence of citation on pages 90 and 91 of the government's brief, the court will see that the nexus was never presented. And so there can't be liability for Enix or anybody else on count nine, which takes me to count eight. Count eight, of course, is tethered to count nine. And it's a similar issue. For count eight to have been, I'm sorry, for 21 United States Code section 856A1 to have been violated, there must have been some purpose on the part of Tim Enix to maintain the South Buffalo Clubhouse for the use or distribution of cocaine or marijuana. Again, it never materialized because it didn't exist. Emmett Green gave testimony on that score as well. And, you know, Emmett Green need not have said that it was a purpose, but he was asked again by Ms. Myers-Buth, you would agree with me, and I'm sorry, this is page A13992 of the record. She asked him, you would agree with me that the primary purpose of maintaining the clubhouse was not for drug use. Emmett Green, the regional president of New York, said no, it wasn't. But that's primary purpose. Correct. And I can speak. It could have a secondary purpose, right? It could have a number of purposes. And that would still be sufficient to find a drug-maintaining premises, right? The statute says the purpose, but I would concede that the case law makes clear that it must have been a purpose, right? It had to have been a purpose. So I guess I don't see how the primary purpose really cuts one way or the other to say, well, they also had a greater overriding purpose, as long as that was a meaningful, substantial purpose. But that's the only question put to any government witness or any proof on the point of whether it was any purpose in this record. And the rest of the record establishes that it was not a purpose, that the drug use was incidental to other usages of the clubhouse. And it has to be kept in mind that 856A1 requires that Enix had it as his purpose, that it be used or maintained for the purpose of use or distribution of narcotics. 856A2 is a broader statute. The purpose in A2 is one that, you know, arguably the government could say. Well, what about the evidence, though, that drug use was rampant and overt and it was, in fact, one of the key, I guess, perquisites of membership, that you got to go to the clubhouse, you got to buy drugs quite easily. And, in fact, drug dealers were allowed in there, even though they weren't members, to basically make sure this membership perk was available. And if it's that overt and ubiquitous, then how could Mr. Enix not have known? Isn't that, I think that's the argument on the other side. It's not so much no, although that's a component of it. But he also has to have intended that it be his purpose. That's why the difference between 856A1 and 856A2 is meaningful here. So you're saying it would be the distinction between knowledge and intent in some way? Yes, yes. And knowledge, deliberate indifference, for example, is contemplated by 856A2. 856A2 punishes the person who, by deliberate indifference, makes a premises available for those who want to use or distribute drugs. 856A1 has a very specific requirement of intent. And that requirement is that the purpose who's alleged to have maintained the premises has to have done it for his purpose. That safe house, that's this court's decision in Wilson. A lot of cases support the difference between those two statutes, and that's meaningful here. Okay. We've kept you up a little below your time. Was there any questions now? Why don't we hear from the government, and we'll hear you back on rebuttal. Thank you very much. Ms. Gregory? Good morning. May it please the court, Catherine Gregory, Assistant U.S. Attorney representing the government. I'm going to try my best to address the significant questions raised by my opponents. But given the number of issues, I would like to focus primarily on the sufficiency   and the jury instructions. I would also like to draw the court's attention to the 28 J letters that we filed with respect to Mr. Park and Mr. Jenkins on count two. Given this court's recent decision in U.S. v. Capers, it's our belief that that is no longer sustainable, and that that should be vacated and remanded for resentencing on the remaining counts.  These opponents' arguments largely rely on disbelieving the testimony of some 60-odd witnesses, disregarding the documentary evidence, over 500 exhibits, photos, cell site information, video, and ignoring their own words. Why don't we just, because there are so many counts and a number of defendants, at least start in maybe a focused way. Why don't we start with the last issue, which is the counts eight and nine that Mr. Grable was talking about, and if you could briefly address those. Yes, and I think it's important to note that it was counts two, eight, and nine that were charged under alternative theories, both primary liability as well as Pinkerton liability. And I'll focus on Pinkerton because I think that that's just easier to meet under the standard all of the government believes it did meet both. So with the drug-involved premises at the South Buffalo Clubhouse, there are dozens of witnesses at trial who say drug use was rampant. It was one of the parks of membership. Every clubhouse, every night, somebody's doing something, whether that's cocaine or meth or marijuana. Multiple witnesses, civilians testified to this, KMC members testified to this, more cocaine, more alcohol, more alcohol, more cocaine. Without that cocaine, they could not keep their membership numbers up. Without that cocaine, they couldn't lure strippers and prostitutes into the clubhouses, and as one witness said, everybody wants to go to a party where there are strippers. Without that cocaine, they could not recruit younger members. And many members sold and used at the clubhouses, but it wasn't just that it created a safe haven for them, which witnesses described as, you know, no one's going to turn you in there if you're doing it at the clubhouse. You know nobody's going to rat you out if you're doing it there. It's also that these dealers used their network, the KMC network, to refer each other to other dealers. Fritz and Long both testified that they would find sources for their drugs or they would source their drugs through other KMC members, guy who knows a guy. Massey testified these clubs are so secretive, they have fortified doors because we are doing drugs behind those doors. That's at 7037 of the appendix. In South Buffalo in particular, multiple witnesses testified as to open drug usage, drugs being kept on the bar, Lortabs being kept in bowls on the bar. The clubhouse had a mirror room where you could do cocaine off a special mirrored coffee table. That's at 11238 to 39 of the appendix. The safe at the South Buffalo clubhouse also had a recent news article about a DEA drug bust. The inference there being, and what the government argued, was that they were trying to keep track of people who might flip, who'd been arrested recently in these DEA busts. And finally, that safe also had Perks phone numbers going back to 1998 in it. I don't think that anyone can reasonably dispute that there were drugs at every clubhouse. Multiple witnesses say the bylaws require I had to go to every clubhouse as a member. The bylaws say you have to visit every clubhouse. And the bylaws themselves also say we are one club. Okay. Every clubhouse operates this way. Testimony and bylaws support that. And then we have the positions of authority and control by Mr. Enix and Mr. Perk. Okay. They're number one and number two in this organization. Enix, in his own words, and excuse my language, I'm just repeating what was in the Facebook post, said, you don't change shit without my say so. Okay. This was an extremely strict organization. Members testified that if you stepped out of line, you were beaten. Okay. If you messed up big enough, you could have a tattoo burned off of your body forcibly. Tennessee members testified that if a member got hooked on the wrong kind of drug, something hard like heroin, they thought about killing him because of it. And Enix and Perk are at the top. Okay. Enix knows granular details about these clubhouses across all four states, down to the level where he's talking about in his Facebook posts. The plumbing issue in that Lucia clubhouse is almost dealt with, don't worry, guys. Or, you know, the paint is still wet in the Jamestown, New York clubhouse. So they know exactly what is going on. The witness testimony supports the fact that changes do not get made without Perk or Enix say so. And Emmett Greene, the New York regional president, actually testified, whenever I talk to one of them about an issue, I inevitably talk to the other as well. Either because Perk would say, make sure you check with Enix, or Enix would call them after he talked to Perk. That's at 12698 of the appendix. Thank you. And we also have their personal conduct. Okay. Every clubhouse operates the same. Well, we have Perk. Witnesses testified that he used cocaine at the New York clubhouses. Okay. That was Mike Long. Mike Long also testified that Enix used cocaine at the Florida clubhouses. Perk was told about supply issues. He bragged that he paid for prostitutes. He called them crack whores. He bragged he paid for them with drugs. And there's a lot of reliance in the reply briefs on Emmett Greene saying, you know, drugs were not a thing. All right. I'm anti-drug. Greene testified that Perk told him to stop kicking people out of the clubs for doing and dealing drugs. Perk said to Greene, you're not the party police. Okay. That's at 12772 to 77. So Greene's view, you know, this one man's view on what should have been going on in the clubhouses or what he may or may not have liked, just demonstrates when Perk tells him, you're not the party police. Stop kicking people out for doing drugs. Of course, this changes when Mr. Perk finds out that there's an investigation. Then it changes to, we need to stop dealing drugs. But until that point, he and Enix both make sure that new recruits don't have law enforcement in their families. That's at 15799 to 800. Enix, in addition to using at the Florida clubhouses, openly discusses his drug use on Facebook and the KMC Facebook group. His hand-picked KMC security detail was made up of dealers and users. I believe Mr. Massey was the one who, when shown a photograph of that security detail, literally went through person by person and said, this is a dealer, this is a dealer, that's a user, that's a user. Mr. Enix had the search warrant information for the South Buffalo Clubhouse at his Florida home. He also had burner phones at his Florida home with 716 area code number saved. 716, of course, being the area code for Western New York and Buffalo in particular. And then finally, Enix and Perk ordered New York President, Regional President Emmett Greene to clear out the clubhouses before those search warrants could be executed. Now, did they say, make sure you get rid of that cocaine and make sure you hide the bags of pills before these warrants get executed? Of course not. It's a conspiracy. This court has recognized conspiracies are, by nature, secretive. Okay? They said, make sure your houses are clean. Make sure everything's proper. Now, I submit, why do you say that to someone? Because you know that things are not proper. You know that there are drugs there. You know that it's common in every clubhouse. So certainly, under the Pinkerton theory, if not under the primary liability theory, Enix and Perk, there was more than enough evidence here to prove their guilt of maintaining South Buffalo beyond a reasonable doubt. Now, with respect to count nine, the possession of firearms and furtherance of drug trafficking, again, I'll focus on the Pinkerton theory first. Again, multiple witnesses, probably a dozen different civilians and members testified, every clubhouse keeps at least a shotgun behind the bar. South Buffalo, in particular, Massey Long testified, kept the shotgun behind the bar, as well as more guns upstairs. They described them as Uzi's or something like that. Some kind of semi-automatic firearm. According to this court's precedent in Snow, weapons being readily accessible, like under a bar, per se, is one factor that you can consider in whether they conferred an actual or potential advantage to the drug offense. And here, I think it's important to remember, maintaining the premises is for the purpose of distributing, packaging, or using. So the use here and the distribution here are important. Of course, there wasn't manufacturing going on here. I don't think that was ever alleged. This isn't a meth house. This is a safe haven to deal and to use. The guns were there to protect the clubhouses. No, there was not specific testimony from any one witness that said, yes, the gun was there to protect the people using at the bar. But I would submit you do not need a shotgun or Uzi's to protect a bunch of middle-aged guys having a couple drinks. You do need a shotgun to protect your legal activities, which I think the testimony more than established, one of those primary activities is being able to use and deal drugs safely. You do need a shotgun to create a place where your members can feel safe to do those illegal activities without fear of interference, whether that be from law enforcement or other clubs. Again, Massey testified these clubhouses are secretive because they're doing drugs. And he said they have naked women running around. But the first thing he said was they're doing drugs. Now, in addition to how these clubhouses operated, everyone is the same. South Buffalo has those guns readily available for any member to use. Testimony was very clear. Doesn't really matter what it's for. They're there for anybody under the shotgun as long as it's a member. Doesn't matter if they're a felon. We have the photo of Enix in South Buffalo with the rifle. There's testimony as well that carrying firearms to KMC parties and events was common. Government also introduced photos to that effect. And I think Enix relies a lot on this argument that he had a license to carry a personal firearm. But having a license to carry a personal firearm does not preclude an unlawful use. Just because you have a license to carry does not immunize you from any kind of 924C charge, depending on how you use that. But of course, under the Pinkerton theory, we don't need to get to his individual carrying of the gun because every clubhouse operates this way. South Buffalo operates this way. We know Enix has been to South Buffalo on several occasions, not just that Christmas card, the Christmas photo, but also he was there for the confrontation with Paul Maui and DJ Szymanski and for one or two other events. The question that this court has to answer is, did the shotgun under the bar, did the Uzi confer some actual or potential advantage with respect to maintaining this clubhouse for one of its primary purposes, which is to create a safe haven for using and dealing drugs? Undoubtedly, it did. Counsel, would you mind directing your attention to the jury instruction question that we discussed with, I think it was Mr. Easton? Yes. The jury instructions here were proper and certainly comported with this court's precedent. In Solano, I think, Judge Nardini, as you noted, this court said, it's a matter of common sense that a defendant in a criminal case has a profound interest in the outcome. That's nothing new. Over and over in Brutus and Gaines and Solano, the court has identified the motive to lie or motive to testify falsely as the problematic language, and you will not find that anywhere in these instructions. The district court was very careful. She said, an interested witness is one who, quote, in your judgment is biased or likely to be biased toward the side which he or she favors. This was followed up with an instruction that this is just one factor, which you may consider in determining the credibility and weight to be given to the testimony of a witness. Bias is just the lens through which we view our world. Of course, the dictionary says it can be a preference, an inclination. It can be implicit or explicit. I think my husband is the most charming man in the world, but I might be biased. That doesn't mean that I'm lying when I say that. That's just because of, as the district court said, the nature of my relationship, friendship, antagonism, or prejudice. Any one of those things. The district court never said, never crossed that line into saying, this creates a motive to testify falsely. And I believe the court in Solano actually bolded and italicized that motive to lie and motive to testify falsely as the problem. So these defendants did not object to this instruction. The review here is plain error. There certainly was no error under the case law at the time. And even now, if there was error, it's certainly not plain. And finally, we didn't really get to the third prong of the plain error test in our brief, but even if it's error, even if it's plain, it did not affect their substantial rights. And this court went through that last prong in Solano to the extent that it examined Munoz. Substantial rights are not necessarily affected if this instruction goes wrong, if the evidence of guilt is overwhelming. And here, I think it's important to look at exactly what Perk and Enochs testified to. And I won't go through the entirety of their testimony, but Mr. Perk, at least, conceded several of the points. Perk and Enochs both discussed the Pagans' raid. Now, they characterized it a little differently, but they both talked about that. They both, on direct, denied doing drugs or wanting drugs in the clubhouse, but on cross-examination, they both admitted that they knew that people were using, or dealing, or both. So in addition to the dozens of witnesses and the documentary evidence and their own testimony, even if this was plain error, it certainly did not affect their substantial rights. I just would like to move to the last sufficiency point with Mr. Perk as to the murder of Mr. Mowrey and Mr. Szymanski. If the court would give me one second. I'm not used to arguments going quite this long. So Mr. Perk, I believe, challenges, and Mr. Jenkins, to an extent, as well, challenges their conviction on the murder counts under the auspices of a Rule 29 motion. So this court's review is de novo. But particularly with respect to the firearms in use of a crime of violence, counts 5 and 6, which corresponded to the murders in counts 3 and 4, the evidence showed, certainly, when you look at all inferences in favor of the government, that Perk knew that there would be a firearm used in this offense. So we established the motive that Perk was furious at this confrontation at the South Buffalo Clubhouse. He told others that he believed Mowrey and Szymanski had been leaking information, that they were leakers, they'd been telling the outlaws about their movements. We know that Perk ordered Caruso to kill Mowrey and that Caruso refused. Perk and Jenkins, here's where we get into the knowledge of the firearm. Perk and Jenkins met surreptitiously in Tennessee as Jenkins was making his way north. Jenkins tells Jimmy Fritz in Tennessee, who he's staying with, I'm on my way to get Caruso. Perk and Jenkins are there with Fritz when Fritz lends Jenkins his motorcycle. Fritz also sells Jenkins the 9-millimeter handgun on his way up to New York. Perk, Fritz, and Jenkins go to the Walmart, where Jenkins then buys the burner phones for use in the murders. Perk, Fritz, and Jenkins go to the Tennessee Moonshine Chapter Clubhouse, where Perk has Fritz turn the camera away so that he isn't recorded having been there. Then inside the clubhouse, they again discuss leakers and taking care of Caruso. And critically, Perk assures Fritz, we're going to try not to use your bike, quote, in the crime. It's at 15382. Perk knows exactly what's going on. Perk is telling Jenkins what to do. It's a reasonable inference. But there's more. Perk and Jenkins travel to New York together. Perk goes to the South Buffalo Clubhouse, where again, he discusses trying to get Caruso. And he has a meeting with Polly and DJ, with Maui and Szymanski, just hours before they're murdered. Right before the murders, Jenkins tells Faulkner, if anything goes wrong, call this number. She later finds out it's Perk's number. It's the call from Perk's phone that night that lures Maui and Szymanski outside the safety of that North Tonawanda Clubhouse. Immediately after the murders, he expresses no surprise when a different member calls and tells him we've been hit, we're under attack. After the murders, Jenkins calls Perk for instructions. Perk tells them where to go. Don't go to any of the Buffalo Clubhouses. Go to Olean, which, if this court is not familiar, is almost in the southern tier, very close to the border with Pennsylvania. Perk also knows details about the murder, including that Jenkins disassembled that firearm and tossed it on the side of the road. So just to summarize, I think my takeaway from your argument is that even if there was no direct evidence of a discussion or an interaction where Mr. Perk gave or talked about a gun, that there was such extensive coordination in the planning that we can reasonably infer that that planning also included knowledge that a gun would be used by Mr. Jenkins to commit the murder. Yes, and I think that especially given the standard of review with the inferences and the credibility determinations in favor of the government at this stage, it is certainly reasonable, especially given that he knows, like, don't worry, Jenkins tossed the gun. It's reasonable to know, based on that extensive coordination, they're traveling together. He's there when he's buying the burner phones. They're together for about 10 days to two weeks. The testimony is a little unclear. And based on the statements he makes after the murders, that he certainly knew. And he certainly also provided substantial steps towards it. It's not just that he knew. He made the phone call that lures them outside. He gives the order. He's not just a bystander. And there's some discussion in the briefs about whether or not this was mere encouragement. But I think that misses the mark when Perk himself took these active steps in these murders. I'm mindful of my time. I would ask if there's any particular areas the court wants me to focus on. No. I would just say, closing then, this was a longer trial than most. I believe it was four and a half months. There are many issues raised on appeal. But ultimately, this is a straightforward analysis for the court. These are familiar standards, especially with count two out of the way. The government presented overwhelming evidence of guilt, both on their primary liability and certainly under the Pinkerton theories for counts eight and nine. And with respect to that evidence, the court has to resolve these inferences and credibility determinations in the government's favor. Simply put, these defendants created a safe haven at every single clubhouse every night for people to use drugs, to deal drugs. It's one of the primary perks of membership. They used violence to intimidate and to prove their loyalty. And they solicited and committed murders of their own Kingsman brothers. They said, you live a Kingsman. You die a Kingsman. This is not an effing social club. The jury took them at their word. So with the exception of count two, we ask the court to affirm the judgments in all remaining respects. Thank you. Thank you very much. Why don't we hear again from Mr. Diehl. You have reserved two minutes for rebuttal. For Mr. Jenkins. Thank you, Your Honor. I'll just start at the beginning of the government's responding argument. 60 witnesses, and I didn't write the number down, but hundreds of documents and evidence supporting the charges. The problem is that we're not asking all 60 witnesses to be disbelieved under the argument I made previously. Your Honor mentioned that could I name a case where the court has gone along with the argument I'm presenting. I can't name a case where every material witness lied so much. You know, we have cases that come up that talk about police officers who have some slight contradictions in testimony that might worry a court. That's not what happened here. What happened here is that every witness that put statements in Mr. Jenkins' mouth or actions attributed to Mr. Jenkins lied either on the stand at the trial, or lied previously, or lied to investigators over and over and over and over again. That's the problem in terms of the nut of our argument in that sense. Again, and I guess I'm limited to the rebuttal of the argument, so I'll, unless there's any other questions. Go wherever you like with 32 seconds. Just to tie it up, the defense of Mr. Jenkins was predicated on an agreement between the parties, and it made it super important that we should have been present for the in-chambers meeting relative to what was observed by Mr. Enix, and that everything fell apart in front of the jury when the defense wall was broken. And I think it was very obvious. And that then allowed the jury, had no other recourse but to follow the similarities in the testimony. The one lone thread that bound all of these liars together. And that's the result that we're here to dispute today. Thank you. Thank you, Mr. Diehl. We'll hear from Mr. Easton. You have two minutes of rebuttal for Mr. Perk. Thank you, Your Honor. I ambitiously wanted to go through three issues in my opening argument. I'll go for the other two, other than the interest of witness charge. The first would be the notice, or the right to be present, about that in-chambers conference between Mr. Enix's lawyers, the government and the district court judge, regarding a court security officer relaying some interchange between jurors regarding their observations of Enix with a younger woman. And the issue here is notice, is that Mr. Perk and his counsel, we were not notified of this conference. We saw a conference. We saw the lawyers leave the courtroom, but we were not notified as to what they were addressing in any way, shape, or form. And counsel, could you tell me, when did you learn about what transpired during that conference? We try to piece that together, Your Honor, is we never learned formally, ever. We never were provided a summary like the other cases that we cited in our brief. The court didn't either transcribe it and give us a copy of the transcript or summarize it for us. So we never formally learned. There's certainly anecdotal gossip about the woman and Enix, but nothing as to what the contents of that conference were. There had been occasions in that trial, and again, as the court's aware of. I mean, I guess there was a reference in the transcript inviting, I guess it was Enix's counsel, Mr. Grable, to approach to talk about this. But it wasn't clear from the transcript what this was and whether others understood at that point what this was. Could you just shed any light on that? We had no idea what this was, Your Honor. We don't certainly have any recollection of that. But what this was, we had no idea. And again, it was a four-month trial. There were opportunities, and each team would have an issue sometimes with scheduling, with medical issues, what have you. We'd have individualized conferences with the judge that had nothing to do with the conduct of the trial. And so the fact that this conference occurred did not trigger in our office an obligation to ask the court, what's that about? OK, I understand. We've used up your time. Sorry you didn't get time for three, but we have your arguments in the briefs, and thank you very much. Mr. Grable, you have two minutes on behalf of Mr. Enix. Correct, thank you. I'll begin on count eight. The government described drugs being present in clubhouses, FERC and Enix having the ability to control South Buffalo Clubhouse, and that Enix saw drugs used in Florida, the pervasive use of drugs in the clubhouse. What I don't hear from any of the government's description is that Enix had the intent to maintain that house for purposes, for the purpose or even a purpose, of the use or distribution of cocaine or marijuana. And this case, I think what the problem we're having is the distinction between 856A1 and 856A2 is being blurred. The government's describing proof that would go to 856A2, but doesn't establish a violation of 856A1 by Mr. Enix. And so that takes us to count nine. The government talked about the snow case. And snow is helpful. It gives us a description of the kinds of things that we can look to to determine whether the nexus exists, whether a gun was, in fact, used in furtherance of maintaining South Buffalo as a drug premises. And it's not an exhaustive list, but it's a helpful list. Drugs in proximity to guns, drug packaging tools, baggies, scales, evidence that packaging has taken place in the snow case, you have a plate with small white cocaine rocks on it. None of that's here. You have drugs, for sure. You have guns in the clubhouse, but you never get the nexus. And the closest we get to finding out whether there's a nexus is when you compare the government's string cited page 89 to the record at 13167 to 1668. And that establishes that the nexus never materialized and that it doesn't exist. The last point I'll make with my seven seconds is I had raised in my brief a rule 701 issue about unhelpful opinions that were obtained from lay witnesses. This court has given other courts, district courts in the Second Circuit, a ton of guidance in a lot of cases. Ray, Ray's Judge Kearse's case. There's a lot of cases where the court says it's not helpful for prosecutors to get opinions when facts can be elicited and the prosecutor can argue in summation for inferences from those facts. In the cases where this court has found over and over again, many of them actually, that there's a violation of rule 701, many of those cases end up turning on harmless error. And in the transcript of this case, the court will see that the prosecutor argued to Judge Wolford the Mitchell case, which is an appendix decision from this court coming out of the Western District.  And in the Mitchell case, this court found, in fact, 701 was violated, but concluded that the error was harmless. I think we have your arguments, and we thank you. We thank all counsel on both sides. Thank you for your very helpful arguments. We appreciate your coming down today, and we will reserve decision.